# IN THE SUPREME COURT OF TEXAS

No. 19-0996

FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE
UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, AND FIRE
INSURANCE EXCHANGE, PETITIONERS,

v.

SANDRA GETER, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,
GERALD HOOKS, JR., LESLY K. NOLEN, AND JOSEPH C. BLANKS, P.C., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued February 3, 2021**

JUSTICE BLACKLOCK delivered the opinion of the Court.

JUSTICE GUZMAN and JUSTICE BOYD did not participate in the decision.

This is the latest appeal in a long-running class-action suit. The primary issue is how to interpret a homeowners insurance policy that has been out of use for nearly twenty years. For the reasons explained below, we conclude that the insurer correctly interprets the policy and was therefore entitled to summary judgment on the individual and class claims. We render a take-nothing judgment on those claims and remand for the trial court to address any remaining matters.

# I. Background

## A. Farmers' Decision to Discontinue the HO-B Policy

Beginning in 2000, the Texas homeowners insurance market experienced a large increase in mold claims. At the time, Farmers Group, Inc.[1] (Farmers), like other insurers, offered a broad "all risk" policy known as the HO-B policy. This policy was approved by the Texas Department of Insurance (TDI) under its statutory authority to approve insurance forms. *See* TEX. INS. CODE art. 5.35. Homeowners insurance policies cannot be issued in Texas without TDI approval. *Id.* art. 5.35(e) ("Unless approved or adopted by the commissioner . . . an insurance policy or endorsement . . . may not be delivered or issued for delivery in this state.").

In November 2001, Farmers and other insurers decided to stop offering HO-B policies. Farmers decided to offer instead a less comprehensive "named peril" policy known as the HO-A policy. A letter from Farmers executive John Hageman to TDI stated that the decision to discontinue the HO-B policy and offer the HO-A policy was "motivated primarily by the dramatic increases that we have experienced for water, mold and foundation claims, and the resultant underwriting losses."[2] TDI approved Farmers' decision and mandated that all insurers remove the HO-B policy from the market by the end of 2002. TDI approved an enhanced HO-A policy, one

---

[1] Petitioners are Farmers Group, Inc., Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, and Fire Insurance Exchange. Like the parties, we refer to the petitioners collectively as Farmers.

[2] This Court later held that the HO-B policy did not cover mold claims. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744 (Tex. 2006).

including coverage for some water claims, which Farmers intended to offer as a substitute for the HO-B policy.

Pursuant to statute, an insurer may choose not to renew a policy so long as it provides the insured a written notice no later than 30 days before the policy expires. TEX. INS. CODE art. 21.49-2B, § 5 (now TEX. INS. CODE § 551.105).[3] In 2002, Farmers sent a notice of non-renewal to its HO-B policyholders, including Respondent Sandra Geter. The notice stated that the policyholders' existing policies would not be renewed and that Farmers would no longer offer the HO-B policy "[b]ecause of substantial losses which we have incurred for the homeowners and dwellings lines of insurance in Texas." The notice informed policyholders that Farmers would continue to offer coverage under its HO-A policy.[4] In August 2002, Geter filed this lawsuit in Jefferson County after receiving Farmers' non-renewal notice.

## B. The Travis County Suit

In addition to the *Geter* suit now before the Court, a separate class-action suit was filed in August 2002 in Travis County. The Travis County suit was originally brought by the State of Texas on behalf of TDI as the sole plaintiff. It accused Farmers of various statutory violations

---

[3] When the Insurance Code of 1951 was re-codified in 2003, one year after this case began, section 5 became section 551.105 of the new Code. *See* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 2, sec. 551.105, § 26, 2003 Tex. Gen. Laws 3611, 3713, 4138. Under section 5, "[a]n insurer shall renew a policy on its expiration, at the option of the insured, unless the insurer has mailed written notice of nonrenewal to the insured not later than the 30th day before the date on which the policy expires." Section 551.105 now states in part: "Unless the insurer has mailed written notice of nonrenewal or renewal with written notice of change in coverage as provided by Section 2002.001 to the insured not later than the 30th day before the date on which the insurance policy expires, an insurer must renew an insurance policy, at the request of the insured, on the expiration of the policy."

[4] In 2003, the Attorney General issued an opinion concluding that an insurer does not violate Texas law in refusing on a statewide basis to renew homeowners insurance policies, so long as it complies with the 30-day notice requirement. Tex. Att'y Gen. Op. No. GA-0045 (2003).

related to the premiums charged for homeowners policies. Specifically, it alleged that Farmers wrongfully raised premiums despite offering less coverage when it replaced the HO-B policy with the HO-A policy. TDI did not allege that Farmers improperly failed to renew the HO-B policies, as Geter alleges. In 2002, the State amended the Travis County suit to include certain class-action allegations. In 2003, class members Gerald Hooks and Lesly Hooks (later Lesly Nolen) alleged that Farmers breached the HO-B policy by refusing to renew it. This breach-of-contract claim mirrored the contract non-renewal claim that is the focus of the pending *Geter* case.

In 2016, after a series of appeals and many years of litigation, the trial court in the Travis County suit rendered judgment approving a settlement agreement. The agreement released various class claims against Farmers but excepted from the release the wrongful non-renewal claim asserted in the *Geter* case.[5]

## C. The Pending *Geter* Litigation

In August 2002, Respondent Sandra Geter filed the Jefferson County suit now before this Court. She claimed that Farmers did not have the right to non-renew HO-B policies, including her policy. She sought a declaratory judgment that the non-renewal was ineffective and that class members were entitled to renew their HO-B policies. She sought and received class certification from the trial court.

---

[5] A supplement to the final settlement agreement amended the definition of released claims to state that "the claim for declaratory relief only . . . which has been certified as a class action . . . in the pending [*Geter* case] is not released." It goes on to state: "The Farmers Parties agree that the settlement of this [Travis County] case will not be used to argue that the declaratory relief claim, which was certified as a class action . . . in the pending [*Geter* case] is barred by the doctrines of res judicata, collateral estoppel, or release . . . ."

The parties filed cross-motions for summary judgment. Farmers relied principally on its statutory right to non-renew policies with 30-days' notice. Geter relied principally on contract language in the HO-B policy. Specifically, Geter relied on paragraph 6 of the "Section I and II – Conditions" section of the policy, which states:

> 6. Refusal to Renew.
>
>      a. We may not refuse to renew this policy because of claims for losses resulting from natural causes.
>         . . .
>
>      d. If we refuse to renew this policy, we must deliver to you, or mail to you at your mailing address shown on the declarations page and any mortgagee named in the declarations page, written notice of our refusal to renew not later than the 30th day before the date in which this policy expires. Proof of mailing will be sufficient proof of notice. If we fail to give you proper notice of our decision not to renew, you may require us to renew the policy.

Geter argued that the mold claims that prompted Farmers to non-renew the HO-B policy were "claims for losses resulting from natural causes" under paragraph 6(a). If that is correct, then paragraph 6(a) prohibited Farmers from refusing to renew the HO-B policy. Additionally, Geter argued that paragraph 6(d) entitled policyholders to renew their policies because Farmers' notice of its "decision not to renew" was not "proper notice," as it was based on a prohibited reason for non-renewal. The trial court granted summary judgment to Geter and the class on Geter's declaratory judgment claim, holding that Farmers breached the insurance contract by not renewing the policies. The court held that each class member was entitled to renew his HO-B policy. The court later ordered Farmers to issue HO-B policies to class members wishing to renew them at a premium set by the trial court. That order has been superseded while the case is appealed, and Farmers has not offered any HO-B policies since 2001.

5

Years later, in 2016, the trial court held a jury trial on attorney fees. Based on the jury's findings and the court's application of a multiplier, the court awarded over $3 million in attorney fees along with substantial costs. Prior to the jury trial, the trial court struck an intervention filed in 2016 by Intervenors Gerald Hooks, Jr., and Lesly K. Nolen, who sought to recover fees for their attorney's work in the Travis County suit that purportedly benefitted the *Geter* class. Hooks and Nolen had intervened in the Travis County suit in 2003 to assert, like Geter, that Farmers wrongfully refused to renew HO-B policies. Joseph C. Blanks, P.C. was counsel for Hooks and Nolen in the Travis County suit. Joseph C. Blanks, P.C. separately intervened in the Jefferson County suit, and the trial court also struck that intervention. The trial court rendered a final judgment in 2017.

The court of appeals affirmed the trial court's judgment insofar as the trial court held that Farmers breached the insurance contract when it refused to renew the HO-B policies. The court of appeals reasoned:

> According to the notice of non-renewal, Farmers made the decision not to renew "[b]ecause of substantial losses which we have incurred for the homeowners and dwelling lines of insurance in Texas . . . ." Hageman's letter further explains that the "substantial losses" which Farmers suffered were "underwriting losses" that resulted from the "dramatic increases that we have experienced for water, mold and foundation claims . . . ." The notice and letter, taken together, establish that (1) the decision to non-renew was made "because of claims," and (2) those claims were "for losses resulting from natural causes"—i.e., "water, mold and foundation claims."
>
> . . . .
>
> Farmers retains its right to refuse to renew for any reason, or for no reason at all, as long as it provides "proper notice," and as long as the reason is not one of the ones prohibited under the policy. Unfortunately for Farmers, the evidence establishes that the reason for its non-renewal in this case was one of the reasons specifically prohibited under the policy. Accordingly, the trial court did not err in ruling that Geter was entitled to renewal under the terms of the policy.

*Farmers Grp., Inc. v. Geter*, ___ S.W.3d ___, ___ (Tex. App.—Corpus Christi–Edinburg 2019).

However, the court of appeals reversed the portion of the trial court's judgment ordering Farmers to issue the insurance policies at a determined premium. The court of appeals remanded the case for a decision on the proper remedy, if any, for the class's breach-of-contract claim. *Id.* at ___ ("We remand the cause to the trial court for further proceedings consistent with this opinion, including . . . determination of . . . what remedy, if any, is appropriate and lawful under the circumstances to address Farmers' improper non-renewal of the HO-B policies at issue . . . .").[6]

The court of appeals affirmed the award to the class of attorney fees and costs. *Id.* at ___. It reversed the order striking the intervention by Hooks and Nolen. *Id.* at ___. It did not address the trial court's decision to strike the intervention of Joseph C. Blanks, P.C. because it found that intervention to be duplicative of the Hooks and Nolen intervention. *Id.* at ___ n.16.

## II. Discussion

### A. Farmers' Non-Renewal of HO-B Policies

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Summary judgment is appropriate when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law on the issues presented. TEX. R. CIV. P. 166a(c). On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 356 (Tex. 2000) (plurality op.). When the trial court grants

---

[6] We need not address the court of appeals' conclusion that specific performance was not available. Because we conclude there was no breach of contract at all, the availability of various remedies for breach is immaterial.

7

one motion and denies the other, the reviewing court must determine all questions presented and render the judgment that the trial court should have rendered. *Id.*

By statute, Farmers was permitted to discontinue its HO-B policy so long as it provided 30-days' notice that the policy would not be renewed. TEX. INS. CODE § 551.105. Geter argues that, notwithstanding Farmers' statutory rights, the insurance policy itself prohibited Farmers from cancelling the HO-B policy. She points to paragraph 6 of the "Section I and II – Conditions" section of the policy, which bars non-renewal "for losses resulting from natural causes." The summary judgment evidence is undisputed that Farmers gave 30-days' notice. The case therefore turns on a question of contract interpretation: whether, notwithstanding statutory compliance and TDI approval of the statewide non-renewal of the HO-B policy, the policy itself prohibited non-renewal in these circumstances because the non-renewal was "for losses resulting from natural causes."

The interpretation of an unambiguous contract is a question of law for the court. *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). Generally, we "give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "Moreover, in cases like this involving a standard form policy mandated by a state regulatory agency, we have held for more than 100 years that the actual intent of the parties is not what counts (as they did not write it), but the ordinary, everyday meaning of the words to the general public." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006).

The factual background is not in dispute. Farmers chose not to renew the HO-B policy because of statewide losses and not because of losses claimed by Geter or any particular policyholder. All insurers, with TDI's approval and indeed insistence, made the statewide decision to no longer offer the HO-B policy.

The dispute comes down to what paragraph 6(a) of the policy means by "claims for losses." If the language refers to "claims" and "losses" of the *individual* policyholder, then Farmers is correct that the policy does not preclude an insurer from terminating the policy's use *statewide* because of systemic losses that make continued use of the policy financially untenable. If "claims" and "losses" also refers to statewide or systemic "claims" and "losses," then Geter is correct that the policy prohibited Farmers from deciding to non-renew. As explained below, we agree with Farmers' reading of the relevant language.

We are guided by the rule of contract interpretation that favors consistent use of a term that is used more than once. "Words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise." *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990); *accord Solvent Underwriters Subscribing to Energy Ins. Int'l, Inc. Cover Note No. EII–3824 v. Furmanite Am., Inc.*, 282 S.W.3d 661, 669–70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). While this rule is not rigidly applied, we have recognized a presumption that identical words used in different parts of the same insurance policy should generally be given the same meaning. *RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 126 (Tex. 2015).

9

Applying this rule, we agree with Farmers that the use of "claims" and "losses" in paragraph 6(a) refers to claims and losses of the individual policyholder. Subsection (c) of the same provision states that "[w]e may refuse to renew this policy if *you* have filed three or more claims under the policy in any three year period that do not result from natural causes." Moreover, the term "claim" throughout the policy refers to claims filed by or against the individual policyholder.[7] All of these subparts relate to the individual policyholder's claims under the policy, not to statewide claims from all policyholders. Likewise, references throughout the policy to "losses" are references to losses of the individual policyholder, not to Farmers' losses on a statewide scale.[8]

Perhaps the clearest indication that paragraph 6(a) has to do with the policyholder's claims and losses—not statewide claims and losses—is the phrasing of the disputed sentence itself. "We may not refuse to renew *this policy* because of claims for losses resulting from natural causes." (Emphasis added). On its face, the sentence deals with "this policy" and whether it specifically—

---

[7] *See* Policy Definitions ¶ 4 ("'Insured' means you and residents of your household . . . ."; Section I – Conditions ¶ 3a ("you must . . . give prompt written notice of the facts relating to the claim"); Section I – Conditions ¶ 3a(6)(b) ("If you elect to make claim under the Replacement Cost Coverage . . ."); Section I – Conditions ¶ 3b(1)(c) (specifying information "you must provide" in connection with a claim); Section I – Conditions ¶ 6 ("If we notify you that we will pay your claim or part of your claim, the notice must also state whether we will or will not take all or any part of the damaged property."); Section I – Conditions ¶ 14d ("If we deny your claim . . ."); Section II – Liability Coverage ("If a claim is made or a suit is brought against an insured . . . we will [] pay . . . for the damages for which the insured is legally liable."); Section II – Additional Coverages ¶ 1 ("Claim Expenses. We pay [expenses and costs] against an insured" and "incurred by an insured"); Section II – Conditions ¶ 9 ("We will notify the insured" of settlement offers and any settlement of "a claim against the insured").

[8] The policy covers "losses" to the dwelling and personal property on the "residence premises" shown on the declarations page, which is specific to the individual insured. *See* Policy Definitions ¶ 9 ("Residence Premises" means the residence premises shown on the declarations page."); Section I – Property Coverage, Coverage A (Dwelling) ¶¶ 1–3; Section I – Property Coverage, Coverage B (Personal Property) ¶ 1; Section I – Extensions of Coverage ¶¶ 1, 2, 4, 6; Section I – Exclusions ¶ 1.

10

not all policies statewide—can be non-renewed. Geter advances a grammatically permissible reading of the sentence that includes expansive connotations of the words "losses" and "claims." But considered in their context, we find no reason to doubt that those words as used in this sentence refer to "losses" and "claims" under "this policy," the policy subject to the no-refusal-to-renew guarantee. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 158 (Tex. 2003) (reading insurance policy "in context, giving effect to all contractual provisions"). The sentence is concerned with "this policy," not with Farmers' statewide business results or with systemic changes Farmers may make to its statewide policy offerings under TDI's oversight.

Geter's position is that Farmers bound itself by contract to perpetually renew all its HO-B policies regardless of its statewide financial results and regardless of whether TDI approved statewide changes to its policy forms. While courts will enforce contracts according to their plain meaning, we also cannot be blind to the commercial realities of the context in which the parties were operating. *See Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (permitting court, in construing contract, to consider the commercial context in which contract was negotiated). We find it highly implausible that the disputed provision, at the time of its approval by TDI, would have been viewed by TDI, Farmers, or the general public as a perpetual prohibition on any statewide amendment to the HO-B form. Such a reading of the policy would undermine TDI's regulatory authority to react to changing circumstances in the insurance industry and would bind Farmers to suffer statewide underwriting losses in perpetuity. Apart from her proffered reading of the contractual text—a reading that is grammatically valid but not compelled by the text—Geter offers no reason to believe the policy language requires such unusual

11

results. In any event, apart from practical considerations, the best reading of the contractual text, within its context, firmly supports Farmers' position.

Geter also focuses on the disputed provision's use of "natural causes." She maintains that Farmers could not refuse to renew her policy due to "claims for losses because of *natural* causes." She alleges that the mold losses which caused Farmers to discontinue the HO-B policy were losses from natural causes. Farmers responds that mold losses are largely from leaking pipes and are not losses from natural causes. We need not address this dispute, however, because the policy only constrains Farmers' authority to non-renew a policyholder's policy for claims made under that particular policy. Whether the statewide claims and losses that caused Farmers to non-renew the HO-B policy happened "because of natural causes" makes no difference. As we have already concluded, paragraph 6(a) is not concerned with statewide claims or statewide losses, whether from natural causes or otherwise.[9]

Geter focuses on paragraph 6(d) in addition to paragraph 6(a). Paragraph 6(d) states: "If we fail to give you proper notice of our decision not to renew, you may require us to renew the policy." Geter argues that Farmers did not give "proper notice" because its notice cited statewide losses from mold claims, which she considers an impermissible basis for non-renewal. Without "proper notice," Geter contends, paragraph 6(d) entitled her to renew the policy. This argument, however, presumes that Geter correctly interprets paragraph 6(a) to prohibit Farmers from

---

[9] Geter further argues that, even if TDI required discontinuation of HO-B policies after December 2002, Farmers discontinued her policy and the policies of other class members before this date. Again, however, her claim still fails if Farmers was permitted by the policy and by statute to decline to renew HO-B policies statewide. As explained above, Geter's individual policy did not prohibit this statewide action, and all her breach-of-contract theories fail as a result.

discontinuing the HO-B policy. As explained above, the premise is faulty. Paragraph 6(a) concerns a policyholder's claims for losses under his own policy, not statewide claims resulting in statewide losses to Farmers. As a result, there was nothing improper about the 30-day notice Farmers provided. Farmers complied with paragraph 6(d)'s 30-day notice requirement, which means Geter cannot require Farmers to renew the HO-B policy.

Although TDI's understanding of the HO-B policy is not controlling, we note that our reading of the policy is consistent with TDI's. In 2002, TDI issued a "bulletin" in connection with the insurance crisis precipitated by mold claims. It stated, in connection with switching from the HO-B policy to the HO-A policy, that an insurer wishing to offer a new policy which reduces coverage "must comply with Section 5 of Article 21.49-2B by mailing proper notice of non-renewal to the insured no later than the 30th day before the date the policy expires." TDI Commissioner's Bulletin No. B-0017-02 (Apr. 11, 2002). At a hearing in the Travis County case, the then-TDI Commissioner testified that the HO-B policy did not prohibit Farmers from discontinuing the policy statewide and that the only requirement for "withdrawing from that product line [under] our analysis was" compliance with the 30-day statutory notice of section 5.

Similarly, in the Travis County case, TDI's then-Deputy Commissioner stated by affidavit that the non-renewal language in the HO-B policy, on which Geter relies, was a TDI form endorsement known as HO-350 and that

> Farmers was not required to offer HO-B homeowners insurance policies to Texas policyholders and indeed could choose not to offer any policies at all. Texas law permits Farmers to discontinue, as it has done, its offerings of HO-B policies to Texas policyholders, and offer, in lieu of the HO-B policy, its amended and revised HO-A policy, which decision has been fully accepted by the Commissioner. TDI's nonrenewal endorsement (HO-350), which has been adopted by Farmers and

13

incorporated in Farmers' homeowners insurance policies, was not intended to limit and does not limit Farmers' ability to discontinue altogether its offerings of HO-B policies in Texas. TDI's nonrenewal endorsements were intended only to limit the ability of Farmers to nonrenew homeowners insurance policies on an individualized basis for the reasons set forth in the endorsement.

The result we reach is likewise supported by the Attorney General opinion, described above, which came to the same conclusion. We treat Attorney General opinions as persuasive but not controlling. *Holmes v. Morales*, 924 S.W.2d 920, 924 (Tex. 1996).

Because the individual plaintiff and class members were not entitled to a renewal of their HO-B policies, all the plaintiffs' claims fail, and summary judgment for Farmers was proper.

## B. Attorney Fees

The trial court awarded substantial attorney fees and costs to the class. The court of appeals affirmed the award. Class members Hooks and Nolen intervened to seek fees related to their attorney's work in obtaining a carve-out of the *Geter* claims from the settlement of the Travis County suit. For the same reason, Joseph C. Blanks, P.C., counsel for Hooks and Nolen in both cases, also sought to intervene. The trial court struck the interventions of Hooks, Nolen, and Joseph C. Blanks, P.C. The court of appeals reversed the order striking the intervention of Hooks and Nolen but did not reverse the order striking the intervention of Joseph C. Blanks, P.C.[10]

---

[10] The law firm identifies itself as a party in joint briefs filed with Hooks and Nolen. As we read the court of appeals' decision, it affirmed the trial court's order striking the intervention of Joseph C. Blanks, P.C., by stating that it was not addressing the firm's appeal, ___ S.W.3d at ___ n.16, and by only remanding the fee request of Hooks and Nolen for further proceedings. Because Joseph C. Blanks, P.C. did not bring a cross-appeal of the court of appeals' ruling, we do not consider its claim for fees, and we affirm the rulings of the trial court and the court of appeals denying the law firm's fee request. *See* TEX. R. APP. P. 53.7(c).

### 1. Fees and Costs to Class Counsel

As to the attorney fees awarded to the class, we reverse the award of fees and costs and remand to the trial court for further consideration of the award. The Declaratory Judgment Act permits an award of "reasonable and necessary" costs and attorney fees "as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. "Where the extent to which a party prevailed has changed on appeal, our practice has been to remand the issue of attorney fees to the trial court for reconsideration of what is equitable and just." *Morath v. Tex. Taxpayer & Student Fairness Coalition*, 490 S.W.3d 826, 885 (Tex. 2016). We will do so here.

When initially awarding fees, the trial court made findings that the plaintiffs were "the successful party in this litigation" and awarded fees based on "the results obtained." On appeal, however, Geter and the class have not prevailed in any regard and have obtained no favorable results. On remand, "the degree of success obtained" should, as always, be "the most critical factor in determining reasonableness of a fee award." *Smith v. Patrick W.Y. Tam Tr.*, 296 S.W.3d 545, 548 (Tex. 2009) (internal quotation marks omitted) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).

### 2. Intervenors' Fee Request

As to the intervention of Hooks and Nolen seeking attorney fees, the court of appeals ruled that the trial court erred in striking the intervention. We disagree.

"Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." TEX. R. CIV. P. 60. A ruling on a motion to strike

an intervention is reviewed for abuse of discretion. *Mendez v. Brewer*, 626 S.W.2d 498, 499 (Tex. 1982).

At the outset, we are loath to find the trial court abused its discretion by striking the intervention when the intervenors' merits arguments fail as a matter of law and the intervenors' efforts have resulted in no benefit to the class. If anything, the intervenors' claim for fees is even more attenuated than the request of class counsel now that the individual plaintiff and the class have recovered nothing in the pending suit. At most, the intervenors have the argument that their efforts in the Travis County suit allowed the *Geter* case to continue, but the *Geter* suit ultimately ends in a take-nothing judgment against the plaintiffs. As a result, Hooks and Nolen have ultimately accomplished no "favorable results" for the *Geter* class.

Hooks and Nolen cite authority that attorneys are sometimes permitted to intervene in hopes of obtaining or protecting their fees.[11] But these authorities do not hold that a trial court must always entertain such requests. Again, where success on the merits is the most important factor in determining fees, and where the intervenors ultimately obtained no relief for the class, we decline to hold that the trial court must on remand entertain the intervenors' quixotic quest for fees.

---

[11] *Hoeffner, Bilek & Eidman, L.L.P. v. Guerra*, No. 13-01-503-CV, 2004 WL 1171044, at *5 (Tex. App.—Corpus Christi–Edinburg May 27, 2004, pet. denied) (mem. op.); *Schaeffer v. O'Brien*, 39 S.W.3d 719, 720 (Tex. App.—Eastland 2001, pet. denied); *Sommers v. Concepcion*, 20 S.W.3d 27, 31 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *Cantu v. Butron*, 921 S.W.2d 344, 347 (Tex. App.—Corpus Christi–Edinburg 1996, writ denied); *Schwartz v. Taheny*, 846 S.W.2d 621, 622–23 (Tex. App.—Houston [14th Dist.] 1993, writ denied); *Rocha v. Ahmad*, 676 S.W.2d 149, 152 (Tex. App.—San Antonio 1984, writ dism'd); *Birge v. Conwell*, 105 S.W.2d 407, 409 (Tex. Civ. App.—Amarillo 1937, writ ref'd).

Farmers offers additional persuasive reasons for concluding that the trial court did not abuse its discretion in striking the intervention. It points out that Hooks and Nolen could have sought fees in the Travis County suit. If they thought their efforts in the Travis County suit were essential to preserve the contract claim asserted by Geter in the Jefferson County suit, the Travis County court was in a better position to evaluate whether that argument had merit and justified an award of fees. The Jefferson County court was not in an ideal position to parse through the massive record from another court, created over fourteen years of litigation, and decide the efficacy and necessity of the efforts undertaken by counsel in another case. If Hooks and Nolen thought they were entitled to fees because of their lawyer's work in the Travis County suit, they could have pursued fees in that case.

Farmers also argues that Hooks and Nolen unduly delayed seeking fees. In May 2003, Hooks and Nolen intervened in the Travis County suit and asserted a claim mirroring the *Geter* non-renewal claim. They also sought attorney fees. Hooks and Nolen did not intervene in the Jefferson County suit to seek fees until June 2016. By that time, both suits were almost fourteen years old. The trial court was entitled to consider the long delay in asserting a right to fees when denying the intervention. In a case where the would-be intervenor is "virtually represented," such as a class action, a lack of timeliness in intervening can justify striking the intervention. *In re Lumbermens Mut. Ins. Co.*, 184 S.W.3d 718, 726 (Tex. 2006) (orig. proceeding). In evaluating timeliness in this context, the court may consider "the existence of unusual circumstances militating either for or against a determination that the application is timely." *Id.* In this case, we have the unusual circumstance of two cases running in parallel for exceedingly long periods. The

17

trial court was entitled to conclude that Hooks and Nolen could have pursued fees in one or both suits at an earlier time. "For any rational and workable judicial system, at some point litigation must come to an end, so that parties can go on with their lives and the system can move on to other disputes." *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 750 (Tex. 2017).

The trial court also faced the unusual circumstance of being asked to decide fees for work done long ago in another case. Assuming that such a request is permitted at all, the trial court could have reasonably considered the request to impose an unreasonable burden on a court totally unfamiliar with the work done by counsel in a complex case in another court. To permit the intervention and entertain the fee request, the trial court would have been forced, after fourteen years of litigation, to decide whether Hooks and Nolen had indeed saved the contract claim from being released in another ancient case. It would have also faced other complexities naturally arising from a fee request based on work done in another lawsuit. We cannot conclude the trial court abused its discretion in declining to take on such a burden at the request of parties whose connection to the Jefferson County suit was tangential at best.[12]

In short, under an abuse of discretion standard, we conclude the trial court had "sufficient cause" to strike the intervention of Hooks and Nolen. TEX. R. CIV. P. 60. The court of appeals erred in reversing the striking of the plea in intervention.

---

[12] In evaluating delay in this context, the court may consider prejudice to the existing parties of allowing the intervention. *Lumbermens*, 184 S.W.3d at 726. Farmers argues that permitting the intervention would have necessitated a delay in the jury trial on fees scheduled for November 2016 to allow for discovery. Farmers points out that Hooks and Nolen filed documents listing trial exhibits and witnesses and an expert they planned to call at trial. The trial court was entitled to consider this factor as well in striking the intervention.

### III. Conclusion and Disposition

Farmers was entitled to summary judgment on Geter's breach-of-contract claim for non-renewal of the HO-B policies. We reverse the court of appeals' judgment regarding this claim and render judgment that the plaintiff and the class take nothing on this claim. We reverse the court of appeals' judgment on the fee request of class counsel and remand the case to the trial court for further proceedings on the requests for attorney fees and costs. We also reverse the court of appeals' judgment insofar as it revived the intervention of Hooks and Nolen, and we reinstate the trial court's order striking the intervention. Finally, we affirm the court of appeals' judgment insofar as it affirmed the trial court order striking the intervention of Joseph C. Blanks, P.C.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** April 9, 2021

19